Edgar L. BURNETT, Plaintiff-Appellant,

v.

CHICKASAW AREA DEVELOPMENT COMMISSION, Defendant-Appellee.

No. 79–1200.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 10, 1981.

Decided Oct. 6, 1981.

Rehearing and Rehearing En Banc Denied Nov. 24, 1981.

Jerry Charles Cox, Richard H. Donnell, Jackson, Tenn., Robert Belton, Nashville, Tenn., for plaintiff-appellant.

Mike Mosier, Henderson, Tenn., for defendant-appellee.

Before WEICK and JONES, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

WEICK, Circuit Judge.

Burnett has appealed to this court from a judgment of the district court in favor of the defendant-appellee Chickasaw Area Development Commission, a private Tennessee corporation not for profit, funded by the federal government dismissing, after a trial on the merits, his complaint alleging violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* The complaint originally had additionally

alleged violations of 42 U.S.C. §§ 1981, 1983 and 1985 and sought class action relief. Subsequently, class action certification was denied by the district court and the claims under 42 U.S.C. §§ 1981, 1983 and 1985 were dismissed because they were barred by the Tennessee statute of limitations. Tennessee Code Annotated, § 28–304. The dismissal of these additional claims is not an issue in this appeal.

In essence, Burnett in his complaint charged that the Commission had intentionally and wrongfully discharged him from his position as Emergency Food and Medical Director because of his race (black) and by failing to consider and hire him for the position of Cannery Supervisor and Acting Head Start Director.

In its answer, the Commission denied that it discriminated against Burnett, on account of his race, intentionally or otherwise. It alleged that Burnett's position as Emergency Food and Medical Director was terminated solely because the federal funding for the program had run out. The Commission further denied that there were other positions available at the time of the termination of his employment for which he was qualified. It alleged that it did offer Burnett a job as cannery operator at a lower salary, but he declined to accept it.

The case was tried in the district court without a jury before District Judge Robert M. McRae, Jr., who heard the testimony of many witnesses and admitted numerous exhibits into evidence. At the close of plaintiff's evidence, the Commission moved for dismissal of the complaint for failure of proof which motion was denied by the court as shown by the following colloquy:

> The Court: All right, I overrule the motion, I do believe the authorities require the defendant to go forward with the proof.
>
> Mr. Mosier (defendant's counsel): Thank you, Your Honor.
>
> The Court: I'm not ruling on the final case, but the *McDonald* (sic) case does set up what is required. (J.A. 152).

This ruling applied *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which holds that after a prima facie case of discrimination has been proved, the defendant is required to go forward with its proof. This the court required the Commission to do.

After hearing and considering all of the evidence and exhibits which in substance are contained in an appendix consisting of 326 pages, the court announced its decision in which it made oral findings of fact and conclusions of law which were copied into the record and are included in the appendix. They were as follows:

> THE COURT: All right, the Court will announce its ruling by making an oral Finding of Fact and Conclusion of Law. And the Clerk will enter a judgment based upon these oral findings and conclusions.
>
> The basic facts are not in dispute, such as the Defendant actually came into operation only on January 1, 1972 at which time the Plaintiff, along with other employees who had been employed at the Shiloh Area Development Commission were enrolled as employees of the Defendant.
>
> At that time the Plaintiff was the Emergency Food Director, at a salary of approximately seven thousand dollars a year. His duties were multiple, and among those duties was the overall administration of the one cannery that had been started under the Shiloh Operation at Milledgeville, and had been opened and operated by Mr. O'Neal Deming since its inception.
>
> The Plaintiff's other duties included the distribution of seeds, and otherwise trying to administer the funds that were available under his area.
>
> Now, he did not require any particular knowledge about the Cannery, his duties were, as I say, were administrative. He would require some basic training in order to be a Cannery Operator. And he certainly acquired no knowledge that would qualify him to repair those items to any considerable degree.
>
> From the proof I think it is inescapable that the reason he was terminated was

that in this bureaucratic distribution of funds the particular funds for his job were not made available after June 30, 1972.

Now, it is unfortunate that the Plaintiff had cast his lot with this jargon and this type of job where titles are used and dependency is made upon the federal money, and it has to be distributed in accordance with a complex set of regulations, and under the direction and supervision of some state and federal regulation experts. Certainly I am not knocking it, that's the way it has to be when you are dealing with government money. But I do say that the Plaintiff's job was terminated because the funds were withdrawn.

Now, I further find that the organization at or about the time, or even shortly before he was terminated, that the Defendant organization determined that they would open additional canneries.

I find that the Defendant supervisory personnel undertook to and did hire as the man to be the supervisor of the installation and operation of these canneries Mr. O'Neal Deming, who was the most qualified man to do the job that was needed to be done. Namely, seeing that the people were trained to operate the canners and that the canners were being set up, and they would be maintained at all times by his own training he has received and his own efforts. Of course, he is a white person. And I further find that his job was not advertised, although there was testimony it was custom to do that. I could not find anybody that had seen the ad or actually knew that it was made. However, I don't think that's vital to the position of the Defendant.

Now, with regard to the Headstart, the facts are disputed. The Plaintiff did apply for the Headstart position and he was not hired in preference to a black female who became hired. I find that an acting Director of the Headstart Program was appointed without an advertisement. I'm not sure, but I assume from all the notoriety that the Acting Director was white. I don't know, but I will assume that she was. But in any event, there was no advertisement.

Now, in a case of this kind a Plaintiff has the burden of proving an intent to deprive him of rights because of his race. Now, I disagree with Mr. Cox's argument to the extent that disparate treatment can cause this Court to grant the relief. And I am sorry I don't know the name of the series of cases, but the Supreme Court and the Sixth Circuit have spoken to this recently by saying that even though an act of an organization or even a city creates a disparate relationship or treatment, unless it was intended in an unconstitutional manner the Courts should not intercede.

So this Plaintiff has the burden of proving what he claims, and that is, that he was terminated because of his race, or that in some way he was not hired for a job because of his race.

Now, I agree that it was of little help to offer him the Canning Operator job, but I don't think we get to that because I must conclude that this Plaintiff has not carried the burden of proving that he was terminated because of his race, or he was not hired as Canning Supervisor because of his race, or that he was not hired as the Headstart Director because of his race, or that he was not hired as Acting Director of Headstart because of his race.

With regard to the notice, I must conclude that there is no requirement in the Constitution saying that a company must post notices or advertise. Now, this is a policy it would be wise to follow, and really is an excellent policy, because it eliminates this constant suspicion that when you don't advertise then the boss and the committee get together in private and say let's just hire ole so and so. If you have it all out in the open reasons have to be stated and you can't use it as a subterfuge.

Because I have found that the Defendant did the most logical thing, and that was to elevate Mr. Deming to the job of Cannery Supervisor, it isn't that great. As he continually said, that position isn't the

best in the place, but he does a good job at it, and it was logical. There was no intent not to hire the Plaintiff because he was black in that regard.

It probably is in the record more carefully than I have been shown, but this company or corporation was not one that was lopsided white at the top. The supervisor of the Plaintiff was a black person. Now, I'm taking him at his word that there was a personality conflict, and there can be personality conflicts between two white people, two black people, or a white and a black person. I'm really not putting much emphasis on that. I'm really not putting any emphasis on it, although it does show that Deputy Director is black and the Plaintiff himself was hired as a black person and the statistics show there have always been a representative number of blacks working in the organization.

I imagine on closer examination would indicate more blacks have more lower paying jobs than whites, but in any event I find non-discriminatory treatment or positions.

I can't help but feel some sympathy for the Plaintiff, who is an educated gentleman, and I agree offering him a Canning Operator job was not very helpful. As a matter of fact, sort of pouring salt on. But in any event I am bound by the principles of law.

If this is a McDonnell Aircraft versus Green case, and I doubt that it is, I find that a prima facie case is made that he is a member of the minority race. The only possible problem you would have would be Mr. Deming, and I think the Defendant Corporation has explained why they hired him for that job. That was not the same kind of job that the Plaintiff had, this was an active working job of setting up these canneries, not being a supervisor where you have a job where you didn't have to do anything but pick up time sheets, and also be aware and make known to the public the existence of this Cannery and promote it and things of that sort.

I will direct the Clerk to enter a judgment for the Defendant by reference to these findings, and I don't intend to write them up any more.

Are there any questions from the attorneys about the procedure?

If not, Mrs. LaFon, you may adjourn the court.

In our opinion, the court's findings of fact are supported by substantial evidence and they are not clearly erroneous. Rule 52 Fed.R.Civ.P. Counsel for appellant contends that the Federal Rules of Civil Procedure are inapplicable in Title VII cases, but we disagree.

There was no substance to Burnett's claim that he was discharged from his position of Emergency Food and Medical Director because of his race. A number of witnesses, including the Commission's executive director and the director of personnel testified that federal funds specifically provided therefore were withdrawn and these witnesses were credited by the District Judge, as was his function.

Burnett did not accept the lower grade position as cannery operator, as was his privilege.

The burden of proof was upon Burnett to prove racial discrimination, but this he failed to do as found by the District Judge and we agree. The duties of Burnett in the performance of his position as Emergency Food and Medical Director were largely administrative and he had little knowledge of the actual operations of the cannery and could not do any repair work or establish additional canneries. Burnett had a supervisor who was deputy director and was black. The deputy director did not think much of Burnett's performance, tardiness, open disobedience and resentfulness.

Burnett claims that he should have been offered the position occupied by O'Neal Deming who had actually operated the single cannery while Burnett was Emergency Food and Medical Director. Deming later became Cannery Supervisor with expanded duties to open and operate new canneries. Burnett contends that the Commission should later have offered the position to

him, although he never applied for it. Two witnesses testified he was not the best qualified to perform the work. They were Robert Vinson, Executive Director of the Commission, and Max Brewer, former Executive Director. The District Judge dealt with this matter in his findings of fact and found that Deming "was the most qualified man to do the job that needed to be done." The Commission was not required to employ anyone who was not well qualified, irrespective of his race.

As to Headstart Director, the Commission employed a black female, Ms. Hay, instead of Burnett. This hardly indicates racial discrimination. When Ms. Hay became ill, the Commission employed Mary Nell Johnson, a white woman, to take Ms. Hay's position during her illness.

We do not overlook the Supplemental Authorities of Edgar L. Burnett as plaintiff-appellant filed by his counsel in this court on October 6, 1980, in which he states *inter alia*:

2. *Burdine v. Texas Depart. of Community Affairs*, 608 F.2d 563 (5th Cir. 1979), *cert. granted* [447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112] (1980), like the instant case, involved a claim of discrimination under Title VII against a community action agency. *Burdine*, virtually indistinguishable on the facts and law from the instant case, supports Burnett's arguments on both issues that he raises in this appeal.

*First*: *Burdine* holds that a Title VII claim against a community action agency is governed by Title VII law and not the constitutional standard established in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *Burdine*, 608 F.2d at 566. *See* Burnett's Main Brief, pp. 17–18.

*Second*: In *Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), the Supreme Court refined its holding in *Furnco* and *McDonnell Douglas* on defendant's burden in a disparate treatment case. *Sweeney* held that defendant's burden is not to "prove" a legitimate nondiscriminatory motive for its action; its only obligation is to "articulate" or "show" such a basis for its action. *Burdine*, construing *Sweeney*, held that "articulating" a legitimate reason involves more than stating fictitious reasons; "*legally sufficient* proof is needed before the trier of fact can find plaintiff's proof rebutted." *Burdine*, 608 F.2d at 567 (emphasis in the original).

*Third*: *Burdine* holds also that *Sweeney* requires a defendant to prove nondiscriminatory reason by a preponderance of the evidence. 608 F.2d at 567.

*Fourth*: *Burdine* holds that in discharge cases involving disparate treatment incident to a reduction in force, the *Sweeney* articulization [sic] standard is not met by a defendant who relies on an unsustained assertion of "qualifications" and "prior work record." A defendant must produce evidence "that will allow a true *comparison* of individuals hired and rejected." 608 F.2d at 568 (original emphasis). Moreover, reliance upon subjective evaluations and recommendations is also insufficient. *Id.* See Burnett's Main Brief, at 23–24.

The only trouble with this argument is that the Supreme Court vacated the judgment of the Fifth Circuit Court of Appeals and remanded in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the syllabus of which is as follows:

1. Civil Rights

In employment discrimination suit, ultimate burden of persuading trier of fact that defendant intentionally discriminated against plaintiff remains at all times with plaintiff. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2. Civil Rights

Burden of establishing prima facie case of disparate treatment in employment discrimination suit is not onerous, but plaintiff must prove by preponderance of evidence that she applied for available position, for which she was qualified, but was rejected under circumstances which give rise to inference of unlawful discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

3. Civil Rights

When plaintiff had proved prima facie case of employment discrimination, defendant bore only burden of producing evidence that legitimate, nondiscriminatory reasons existed for challenged employment action and did not bear burden of persuading court that it was actually motivated by proffered reasons; it was sufficient if defendant's evidence raised genuine issue of fact as to whether it discriminated against plaintiff. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

4. Civil Rights

To rebut presumption of employment discrimination raised by prima facie case, defendant must clearly set forth, through introduction of admissible evidence, the reasons for plaintiff's rejection and articulation not admitted into evidence, such as answer to complaint or argument of counsel, will not suffice; explanation provided must be legally sufficient to justify judgment for defendant. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

5. Civil Rights

Title VII did not require employer to hire or promote minority or female applicant whenever that person's objective qualifications were equal to those of white male applicant. Civil Rights Act of 1964, § 703(j), 42 U.S.C.A. § 2000e–2(j).

6. Civil Rights

Title VII does not demand that employer give preferential treatment to minorities or women, nor does it require employer to restructure his employment practices to maximize number of minorities and women hired. Civil Rights Act of 1964, § 703(j), 42 U.S.C.A. § 2000e–2(j).

7. Civil Rights

Employer has discretion to choose among qualified candidates, provided that decision is not based on unlawful criteria and fact that court may think that employer misjudged qualifications of applicants does not in itself expose him to Title VII liability, although this may be probative of whether employer's reasons are pretexts for discrimination. Civil Rights Act of 1964, § 703(j), 42 U.S.C.A. § 2000e–2(j).

There was not an iota of evidence offered by Burnett of any intentional discrimination against him or that the employer's reasons were pretextual.

We are unable to understand the Supplemental Brief filed by Burnett in which he cites the Supreme Court decision in *Burdine* which reversed the Fifth Circuit decision on which he then relied and he now claims that *Burdine* supports his contentions. He is wrong.

The judgment of the district court is affirmed.

JONES, Circuit Judge, concurring in part and dissenting in part.

Edgar L. Burnett, a black male, filed this employment discrimination case under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* against his former employer, the Chickasaw Area Development Commission (CADC). The district court held that though Burnett established a *prima facie* case of discrimination, the CADC articulated legitimate, nondiscriminatory reasons for Burnett's discharge and for the CADC's failure to consider Burnett for certain positions. In its decision today, the majority of this panel affirms the judgment of the district court in its entirety. I concur in the majority's opinion insofar as it holds that the CADC stated legitimate nondiscriminatory reasons for its employment decision respecting Burnett's discharge and Burnett's rejection from the Head Start positions. However, I dissent from the majority's holding, in effect, that the CADC's failure to consider Burnett for cannery supervisor may not be actionable. I would reverse the district court on this latter issue and remand the case to the court to determine why the CADC refused to consider Burnett for cannery supervisor.

I.

The CADC is a private, nonprofit Tennessee Corporation which was formed on Janu-

ary 1, 1972, pursuant to the Economic Opportunity Act of 1964, as amended, 42 U.S.C. § 2701 *et seq.* As such, the CADC organizes and administers so-called "anti-poverty" programs in western Tennessee. Like its predecessor, the Shiloh Area Development Corporation (SADC), the CADC's sole source of funding is the federal government. These funds are channeled through the State of Tennessee.

Burnett, a former employee of SADC from 1965 to 1971, was employed by the CADC as the emergency food and medical director. During Burnett's tenure at SADC, he also served as an agriculture specialist and an equal employment officer. Prior to 1965, Burnett taught in and administered public schools in Tennessee for over thirty years.

As the CADC's emergency food and medical director, Burnett was responsible for the administration of the CADC's only cannery. His duties included the distribution of seeds and the administration of funds. His responsibilities included the supervision of O'Neal Deming, a white male and the cannery operator. Burnett had previously supervised Deming's job performance in the cannery operation at SADC.

On June 7, 1972, the CADC notified Burnett that effective June 30 of that year his position as emergency food and medical director would be terminated for lack of funding. Burnett was offered the job of cannery operator (Deming's position) at a substantially lower salary. Burnett refused the offer because he believed the job to be seasonal. Between June 7 and June 30, 1972, the CADC decided to open additional canneries. On July 1, 1972, the day after Burnett's termination, the CADC promoted Deming to the new position of cannery supervisor. The CADC conceded in its pleadings that Burnett was not considered for cannery supervisor. Nor was the supervisor position advertised in accordance with

the CADC's established policy. Additionally, Burnett was not apprised of the position until a year after his discharge. Once Deming's promotion became effective, the CADC paid for Deming to attend canning processing school. Furthermore, Deming's salary for the supervisor position was paid with federal funds administered by the state.[1]

Soon thereafter, the CADC advertised the position of Head Start Director. On July 18, 1972, Burnett applied for that position and on August 2, 1972 he was notified that he had been rejected. A black female was selected. When the Head Start Director became seriously ill, the CADC appointed a white female Acting Head Start Director without advertising for other applicants.

On August 12, 1976, Burnett filed his complaint in the district court alleging employment discrimination based on race, in violation of Title VII and 42 U.S.C. §§ 1981, 1983 and 1985. Burnett contended (1) that his discharge from the CADC violated Title VII and (2) that the CADC's failure to consider him for certain supervisor and Head Start positions constituted unlawful disparate treatment. The district court held that the statute of limitations barred the § 1983 causes of action. After a trial on the merits on September 19, 1978, the district court held that Burnett failed to prove employment discrimination on account of race with respect to his discharge or the CADC's failure to employ him as cannery supervisor or in the Head Start positions. The district court held, in effect, that even if Burnett established a *prima facie* case of disparate treatment under Title VII, the CADC successfully rebutted the presumption of discrimination by articulating "legitimate, nondiscriminatory reason[s]" for its decision to discharge Burnett and its refusal to offer him the other positions.

---

1. On July 11, 1972, the CADC issued a memorandum announcing Deming's new position and indicating that it was funded by additional sums received from the state emergency food program. This memorandum was subsequent-

ly discredited by the testimony of the CADC's executive director, Robert Vinson, who attested to the fact that the only funds the CADC utilized were federal monies administered through the State of Tennessee.

## II.

The basic allocation of the burden of proof in Title VII employment discrimination cases was initially set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, and its progeny, the Title VII plaintiff bears the burden of establishing a *prima facie* case of disparate treatment. "The plaintiff must prove by a preponderance of the evidence that [he or she] applied for an available position, for which [he or she] was qualified, but rejected under circumstances which give rise to an inference of unlawful discrimination.[2] *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Once the plaintiff establishes the *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment decision. *McDonnell Douglas v. Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824. The effect of this intermediate evidentiary burden is to require the employer to rebut the presumption of discrimination created by the establishment of the plaintiff's *prima facie* case. *Burdine, supra*, 101 S.Ct. at 1094. The employer successfully rebuts the presumption of discrimination when it "clearly set[s] forth, through the introduc-

tion of admissible evidence, the reasons for the plaintiff's rejection." *Id.* The employer's explanation "must be legally sufficient to justify a judgment . . ." in its favor. *Id.* Additionally, the employer "cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Id.*, 101 S.Ct. at 1094 n.9. Moreover, the employer's "explanation of its legitimate reasons must be clear and reasonably specific." [3] *Id.*, 101 S.Ct. at 1096.

Finally, if the employer rebuts the presumption of discriminatory treatment, then the plaintiff "retains the burden of persuasion . . . . [The plaintiff] must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision . . . ," *id.*, 101 S.Ct. at 1095, but merely a pretext. Therefore, once the burden of proof shifts back to the plaintiff, the plaintiff has the "ultimate burden of persuading the court that [he or she] has been a victim of intentional discrimination." *Id.*

Applying these principles, I would hold that the district court erred in holding that even if Burnett established a *prima facie* case of discriminatory treatment that the CADC effectively rebutted the presumption of discrimination.

A fair reading of the transcript of the district court's oral disposition of the case[4]

---

**2.** This test was originally phrased by the Supreme Court to require the Title VII plaintiff to show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824. In this respect, the Supreme Court has noted that the *prima facie* proof will vary as the underlying factual setting varies. *Id.* at 802 n.13, 93 S.Ct. at 1824 n.13. Furthermore, this initial burden is not meant to be onerous. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094 (1981). Rather, the reason for allocating the burden of proof to the plaintiff in this manner is because "[t]he *prima facie* case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection," *id.*, i. e., "an absolute or relative lack of

qualifications or the absence of a vacancy in the job sought." *Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866, n.44, 52 L.Ed.2d 396 (1977).

**3.** In *Burdine*, the Supreme Court recognized that this obligation "arises both from the necessity of rebutting the inference of discrimination arising from the *prima facie* case and from the requirement that the plaintiff be afforded 'a full and fair opportunity' to demonstrate pretext." 101 S.Ct. at 1096.

**4.** Burnett contends that the district court erred by applying the constitutional theory of purposeful discrimination as set forth in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). However, though the district court initially stated:

> Now, I disagree with Mr. Cox's argument to the extent that disparate treatment can cause this Court to grant the relief. And I am sorry I don't know the name of the series

indicates that the court found that Burnett had carried the initial burden of proving a *prima facie* case of employment discrimination. I agree. Burnett was a member of a racial minority. His years as SADC and his relevant experience qualified him for the position of emergency food and medical director of the CADC and for the positions of cannery supervisor, Head Start Director and Acting Head Start Director. He was discharged from his former job as emergency food and medical director and rejected from the latter jobs of cannery supervisor and Head Start Director. His former position was abolished while other individuals were selected for the supervisory and Head Start positions.

Burnett argues that the district court erred in holding that the CADC articulated a legitimate nondiscriminatory reason for Burnett's discharge. I disagree. As its reason for Burnett's discharge, the CADC produced evidence of the termination of federal funding for Burnett's position as emergency food and medical director. Burnett accurately points out that the CADC's July 11, 1972 memorandum announcing Deming's new position as cannery supervisor incorrectly stated that Deming's salary would be paid through state emergency food funds when in fact the CADC's antipoverty programs were funded entirely by federal monies administered through the State of Tennessee. Therefore, it appears that the federal monies utilized to compensate Deming could have been used to fund Burnett's former position. Nevertheless, trial testimony of the CADC's executive

director and the director of finance and personnel indicates that the federal funds specifically set aside to pay Burnett's salary as emergency food and medical director were withdrawn by the federal agency funding that program. Furthermore, at the time of this appeal, the CADC had not filled Burnett's former position. This explanation satisfied the CADC's burden of articulating a legitimate reason for Burnett's discharge.

Burnett contends that he was the victim of disparate treatment in not being considered for the position of cannery supervisor while Deming was appointed to it. He contends that the district court erred by merely deciding that Deming was the "most qualified man" for the job without determining why the CADC did not consider Burnett for it.

I believe that the district court erred by not inquiring into the CADC's failure to consider Burnett for the position of cannery supervisor. It is clear that the CADC had federal monies to fund the supervisory position. It is equally clear that contrary to established policy the CADC did not seek other qualified applicants for the position. Moreover, the position was not advertised in accordance with the policy of the CADC. Without a specific inquiry into the CADC's reasons for not considering Burnett or anyone else, Burnett's *prima facie* case of unlawful discriminatory treatment remained unrebutted. If Burnett was not considered for the position for racially discriminatory reasons, then the district court's determination that Deming was the best qualified

of cases, but the Supreme Court and the Sixth Circuit have spoken to this recently by saying that even though an act of an organization or even a city creates a disparate relationship or treatment, unless it was intended in an unconstitutional manner the Courts should not intercede . . . .

it seems clear from the district court's subsequent holding that the *McDonnell Douglas* reasoning supported the court's final judgment. The district court concluded that:

[i]f this is a *McDonnell Aircraft versus Green* case, and I doubt that it is, I find that a *prima facie* case is made that he is a member of the

minority race. The only possible problem you would have would be Mr. Deming, and I think the Defendant Corporation has explained why they hired him for that job. That was not the same kind of job that the plaintiff had, this was an active working job of setting up these canneries, not being a supervisor where you had a job where you didn't have to do anything but pick up the time sheets, and also be aware and make known to the public the existence of this Cannery and promote it and things of that sort.

person will not justify judgment in the CADC's favor. Consequently, I would remand the case to the district court to determine why Burnett was not considered.[5]

I agree with the majority that there is no merit in Burnett's contention that his rejection for the Head Start directorship constituted unlawful employment discrimination. Burnett applied for this advertised position and, after consideration of his qualifications, he was rejected. Similarly, Burnett's arguments concerning the position of Acting Head Start Director are groundless.

Accordingly, I would affirm in part, reverse in part, and remand this case to the district court to determine why Burnett was not considered for the position of cannery supervisor.

5. This is my point of departure with the majority's decision in this case. With respect to this supervisory position, the majority rests its decision on the fact that Burnett did not apply for the position. Unfortunately, in doing so, the majority's decision suffers from several flaws. First, Burnett could not have applied for the supervisory position because the CADC failed to advertise it. The district court found that this failure to advertise was in direct contradiction of the CADC's established policy to advertise internally and externally. The majority would hold Burnett accountable for the CADC's failure to advertise. Second, the majority's holding effectively overturns the district court's determination that Burnett established a *prima facie* case of employment discrimination under Title VII concerning the supervisory position. See note 4, *supra*. In *Burdine*, the Supreme Court noted that *prima facie* proof varies with the underlying facts and that the establishment of a *prima facie* case was not meant to be onerous. See note 2, *supra*. The function of the *prima facie* case was to address the most common nondiscriminatory reasons advanced by employers—lack of qualifications and the absence of a vacancy. *Id.* Penalizing Burnett for his failure to apply for a position that he was not aware of due to the CADC's refusal to advertise for qualified applicant does not serve this important function of the *prima facie* case. Third, if the CADC refused to consider Burnett for racially discriminatory reasons, then the majority's condonation of the district court's failure to inquire into the CADC's refusal to consider Burnett leaves Burnett without legal or equitable redress for the violation of his statutory right to seek employment without being exposed to racial discrimination. Therefore, I believe that the majority's decision today cannot be supported in law or fact.